**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1113
_____

CHEIKH DIOP,
a/k/a Ibou Ndiaya,
a/k/a Ebou Njie

Cheikh Diop,

Appellant

v.

ICE/HOMELAND SECURITY;
WARDEN MARY E. SABOL;
THOMAS R. DECKER;
JOHN P. TORRES;
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY;
ATTORNEY GENERAL OF THE UNITED STATES.
_____

On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil Action No. 4:09-cv-1489)
District Judge:  Honorable Malcolm Muir
_____

Argued January 24, 2011
_____

Before:  FUENTES and CHAGARES, Circuit Judges,
POLLAK, District Judge[*]

_____

[*] Honorable Louis H. Pollak, Senior Judge of the United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

1

(Opinion Filed: September 1, 2011)

Cheikh Diop, *Pro se*
131 Woodsick Drive
Wilkes-Barre, PA 18705

Tony West, Esq.
David J. Kline, Esq.
Gjon Juncaj, Esq.
Nicole R. Prairie, Esq. (argued)
United States Department of Justice
Civil Division
Office of Immigration Litigation, District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044

Mark E. Morrison, Esq.
Office of the United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building And Courthouse
Harrisburg, PA  17108

        *Counsel for Appellees*

Judy Rabinovitz, Esq.  (argued)
Farrin R. Anello, Esq.
Tanaz Moghadam, Esq.
Michael K.T. Tan, Esq,
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Witold Walczak, Esq.
Mary Catherine Roper, Esq.
Valerie Burch, Esq.
American Civil Liberties Union Foundation of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213

        *Counsel for Amici Curiae American Civil Liberties
        Union Foundation and American Civil Liberties Union
        Foundation of Pennsylvania*

2

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

A 1996 law requires that the Executive Branch take into custody any person who is removable from this country because he has committed, among other things, a crime involving moral turpitude or a crime involving a controlled substance. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, § 303, 110 Stat. 3009-585-86 (1996) (codified at 8 U.S.C. § 1226(c)). Detention under this authority is mandatory, does not provide for the possibility of release on bond, and does not require that the Executive Branch at any time justify its conduct. Pursuant to this law, the petitioner in this case, Cheikh Diop, was detained for 1,072 days—two years, eleven months, and five days. The District Court concluded that such prolonged detention was lawful. We disagree. For the following reasons, we conclude that the statute authorizes only detention for a reasonable period of time. After that, the Due Process Clause of the Fifth Amendment to the Constitution requires that the Government establish that continued detention is necessary to further the purposes of the detention statute.

I.

Although the merits of the immigration case against Diop are not before us, we chronicle his journey through our complex immigration system in order to illustrate how individual actions by various actors in the immigration system, each of which takes only a reasonable amount of time to accomplish, can nevertheless result in the detention of a removable alien for an unreasonable, and ultimately unconstitutional, period of time.

*Days 1-198.* The story begins with Diop's receipt of a Notice to Appear from the Department of Homeland Security ("DHS") on March 19, 2008, charging him as a removable alien who had entered the United States unlawfully and as an alien convicted of a crime involving moral turpitude, a 2005

conviction in Pennsylvania state court for the crime of recklessly endangering another person. *See* 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), (a)(6)(A)(i); *see also* 18 Pa. Con. Stat. Ann. § 2705. That same day, Diop was detained by the Bureau of Immigration and Customs Enforcement ("ICE").[1] Thirteen days later, on April 1, Diop had his first appearance before an immigration judge. His case was reset so that he could seek counsel. A subsequent hearing on April 29 had the same result. And on May 27, Diop's case became even more complicated when the Government[2] charged that he was also removable as an alien convicted of a crime relating to a controlled substance. *See* 8 U.S.C. § 1182(a)(2)(A)(i)(II). That conviction occurred in 1995, for the Pennsylvania crime of possessing a controlled substance with the intent to manufacture or deliver it. *See* 35 Pa. Con. Stat. § 780-113(a). The immigration judge once again reset the proceedings so that Diop, who had failed to obtain the assistance of a lawyer, would have time to file an application for asylum and withholding of removal, which he did on August 12.

*Days 199-261*. On October 3, an immigration judge heard Diop describe his arrest, detention, and severe beating at the hands of Senegalese government officials. Diop told the immigration court that he fears persecution in Senegal because the government of that country believes, based on the alleged affiliation of members of his family, that he is a member of a separatist group called the Movement of Democratic Forces of the Casamance. The immigration judge found Diop to be a credible witness and presumed that his

---

[1] Immigration and Customs Enforcement is a bureau within the larger Department of Homeland Security. For convenience, we use the term "Government" as a shorthand term to describe their collective efforts, and refer specifically to DHS or ICE only when necessary.

[2] In the District Court, the Government filed the declaration of John Ellington, Deputy Chief Counsel for the Philadelphia Office of ICE. There, Ellington stated that "respondent [Diop] was denied bond" at this May 27 hearing. The declaration provides no further explanation of that statement, the reasons for the denial of bond, or whether Diop was even eligible for bond in the first place.

4

testimony was completely accurate, but nevertheless denied his application for withholding of removal because his 1995 conviction was "probably" for a "particularly serious crime," which would make him ineligible for that kind of relief, and because, even if he was persecuted in the past, changed country conditions mean that there is no presumption that he would be persecuted in the future. 8 U.S.C. § 1231(b)(3)(B)(ii); *Denis v. Attorney Gen.*, 633 F.3d 201, 213 (3d Cir. 2011) (explaining that withholding of removal is unavailable to an alien who has committed a "particularly serious crime").

*Days 262-390*. Diop, still representing himself while detained, filed a notice of appeal. On December 5, 2008, he filed a hand-written appellate brief with the Board of Immigration Appeals ("BIA"). In a March 17, 2009 order, the BIA concluded that the immigration judge should actually determine whether his 1995 conviction was a "particularly serious crime," instead of leaving it open as a mere probability, disagreed with the judge's determination that conditions changed in Senegal, and remanded Diop's case to the immigration judge for further proceedings.

*Days 391-589.* More master calendar hearings followed: one on April 13, 2009, where the case was reset and another on May 4 in which Diop explained that he was trying to obtain representation from a law school clinic. On May 17, Diop filed another handwritten brief with the court. Thirty-eight days later, on June 24, Diop received a second ruling from the immigration judge concerning his application. This time, the immigration judge concluded that Diop's asylum application was untimely, but granted his application for withholding of removal. The immigration judge reasoned that Diop's crime was not particularly serious because Diop testified that his 1995 conviction for drug possession involved marijuana. Furthermore, he ruled that the Government had not overcome the presumption that Diop would face the threat of future persecution if he was sent to Senegal. On July 21, the Government appealed the immigration judge's ruling concerning withholding of removal, providing, for the first time, evidence that Diop's 1995 conviction involved the distribution of cocaine, not marijuana. Diop initially appealed the ruling concerning asylum, but withdrew that

5

appeal on August 4. That same day, Diop filed a *pro se* Petition for Writ of Habeas Corpus in the United States District Court for the Middle District of Pennsylvania. He argued that it is unconstitutional for the government to detain him, pursuant to 8 U.S.C. § 1226(c), for a prolonged period of time without a hearing to determine whether his detention is justified.

*Days 590-754.* Approximately three months later, on October 29, 2009 the District Court denied Diop's habeas petition for two reasons. First, it concluded that Diop's petition was premature. Citing 8 U.S.C. § 1231(a), the District Court observed that, after an order of removal has been entered, the Attorney General has 90 days to remove an alien, during which time the alien must be detained. In Diop's case, removal proceedings were ongoing, so the 90-day period had yet to begin and Diop's petition was filed too soon.[3] Second, on the basis of the Supreme Court's holding in *Demore v. Kim*, 538 U.S. 510 (2003), the District Court concluded that it was constitutional to hold Diop while his proceedings are pending, with no regard to how long the proceedings actually take. Diop then filed a timely *pro se* appeal to this Court.

*Days 755-776.* The appeal in Diop's immigration case—the appeal from the June 24, 2010 decision of the immigration judge—was resolved by the BIA in an order issued on April 12, 2010. However, as in the previous appeal, the BIA once again concluded that the immigration judge's lack of clarity required a remand. Specifically, the BIA explained that a remand was required because the immigration judge's application of the standard for determining what constitutes a particularly serious crime was unclear. Diop, now with help from the appellate litigation clinic at Georgetown University Law Center, filed a motion for reconsideration.

---

[3] The Government concedes that this was error. Respondents-Appellees' Answering Br. 10 n.6. The Government's basis for detaining Diop was 8 U.S.C. § 1226(c), not § 1231. The former governs pre-removal detention, while the latter applies to aliens who have been deemed removable pursuant to a final order.

6

*Days 777-959.* Clarifying himself on remand, the immigration judge decided, on May 4, 2010 that Diop's drug crime was particularly serious and that Diop was ineligible for withholding of removal. On October 26, the BIA affirmed the immigration judge's decision to deny Diop's application for withholding of removal and denied the motion for reconsideration. But, once again, it remanded for further proceedings, this time so that the immigration judge could consider whether Diop might be eligible for deferral of removal pursuant to the Convention Against Torture.

*Days 960-987.* Up to this point, a combination of continuances to find a lawyer and prepare Diop's *pro se* filings, along with several incomplete decisions from the immigration judge, had resulted in a 959 day period of incarceration, with still no indication of when or whether Diop might be able to stay in the United States. During that time, the Supreme Court decided, in *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), that a resident alien's constitutional right to effective assistance of counsel in criminal proceedings requires that he be advised of the collateral immigration consequences of a criminal conviction. On November 3, 2010 the Pennsylvania Court of Common Pleas applied that decision retroactively and vacated Diop's 1995 conviction. A few weeks later, on November 24, the state of Pennsylvania appealed to the Superior Court.

*Days 988-1,037.* On December 1, Diop appeared for yet another master calendar hearing, arguing that the vacatur of his conviction meant that he was eligible for withholding of removal. The Government asked for time to consider the matter and the case was reset. At the next master calendar hearing on January 18, 2011 the Government argued that Diop would only be eligible for withholding of removal if the Superior Court affirmed the Court of Common Pleas's vacatur of his 1995 conviction. The parties then agreed to have a hearing on March 1 regarding Diop's claim of a right to relief under the Convention Against Torture. The next day, amici in Diop's habeas appeal—the American Civil Liberties Union and the American Civil Liberties Union of Pennsylvania (collectively, the "ACLU")—contacted counsel for the Government to seek consent to file a supplemental appendix in this Court updating us on the status of Diop's

7

immigration proceedings. The day after that, on January 20, 2011 the Government reversed its litigating position in the immigration courts and filed a motion stating that Diop was immediately eligible for withholding of removal, even though the vacatur of his 1995 conviction was still on appeal.

*Days 1,038-1,072*. We heard oral argument on this appeal on January 24, 2011. The next week, at a master calendar hearing in the immigration court on February 2, the Government confirmed to the immigration judge that its position was that Diop was immediately eligible for withholding of removal. In a ruling on February 22, the immigration judge granted Diop withholding of removal. Finally, on February 24, 2011 after 1072 days of detention, four rulings by an immigration judge, three rulings by the BIA, a state court ruling on his 1995 conviction and a subsequent pending appeal to the intermediate state court, a ruling by a federal district court judge on his habeas petition, and an appeal to this court, Diop was freed.

The Government waived its right to appeal the February 24, 2011 holding. The next day, it filed a motion in this court arguing that Diop's federal habeas appeal is moot because Diop has been released from custody. Our first task, then, is to determine whether we still have jurisdiction to decide the merits of Diop's habeas petition.

II.

The District Court had jurisdiction under 28 U.S.C. § 2241. Congress has authorized our jurisdiction pursuant to 28 U.S.C. § 1291, but the Constitution vests us with jurisdiction only to decide "cases or controversies." U.S. Const. art. III, § 2; *Turner v. Rogers*, 564 U.S. ---, slip op. at 5 (June 20, 2011). This means that Diop must have "standing"—the personal stake in a lawsuit that exists when a person has suffered an "injury in fact," caused by "the conduct complained of," that can be "redressed by a favorable decision"—at all stages of review and not just at the time he filed his habeas petition. *Camreta v. Greene*, 564 U.S. ---, slip op. at 5 (May 26, 2011); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the

commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal quotation marks omitted)).[4]

Diop's prolonged detention was certainly an injury in fact, caused by the Government, which could have been redressed by a decision from this Court granting his petition for writ of habeas corpus. However, the Government asserts that these things are no longer true, so Diop's case is moot. We disagree. Diop's case falls within the special mootness exception for cases that are "capable of repetition" while "evading review." *Turner*, 564 U.S. ---, slip op. at 6 (quoting *S. Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498 (1911)). This exception applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

The difficulty with determining whether Diop's detention is too short to be fully litigated prior to its cessation is that, although Diop was detained for over three years, the claim that his detention was unlawful could not have been filed immediately. Instead, it would have had to "ripen" at some unspecified time that is "notoriously hard to pinpoint." *Pittsburgh Mack Sales & Services, Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009). Further compounding the difficulty of evaluating claims of unlawful pre-removal detention is that the underlying removal proceedings justifying detention may very well be nearing a resolution by the time a federal court of appeals is prepared to consider them. A court of appeals reviewing these types of claims is therefore presented with a moving target, knowing only that review must happen

---

[4] Standing must be distinguished from the separate and distinct inquiry into whether a petitioner is "in custody," as required under the habeas statutes. "[W]hat matters for the 'in custody' requirement is whether the petitioner was in custody *at the time his habeas petition was filed*." *Kumarasamy v. Attorney General*, 453 F.3d 169, 173 n.7 (3d Cir. 2006). Diop was in custody when he filed his petition.

9

sometime after an alien has been detained and before he is released, but never knowing the precise time period in which the case is ripe.

Given these difficulties, mootness would likely doom almost any attempt to challenge the lawfulness of pre-removal detention. The law is not so rigid. In *United States v. Frumento*, this Court recognized that a case is not moot if a litigant contesting his detention takes "prompt, diligent, and timely" action to perfect his appeal, especially "when fundamental personal liberties are at issue and review of an order of confinement as a practical matter is not available[.]" 552 F.2d 534, 541 (3d Cir. 1977) (en banc); *see also Lee v. Stickman*, 357 F.3d 338, 343 (3d Cir. 2004). Diop had been detained for one year, four months, and sixteen days before he filed a petition for writ of habeas corpus complaining that detention for this length of time was unreasonable and hence, unauthorized. Once filed, his actions in that proceeding were "prompt, diligent and timely," as was his conduct in the subsequent appeal to this court. Assuming, without deciding, that his claim was ripe on the day he filed his petition, Diop's detention for another year, six months, and twenty days was less than the two years the Supreme Court has found to be too short to be fully litigated in other contexts, *see Turner*, 564 U.S. ---, slip op. at 6 (citing *S. Pac. Terminal Co.*, 219 U.S. at 514-516 (1911) for the proposition that a two-year period can be too short), and is the type of claim that, given the practical reality of its highly contingent nature, will always evade review.

Diop's claim is also capable of repetition. The Government, which bears the burden of proving that this appeal is moot, *Princeton Cmty. Phone Book, Inc. v. Bate*, 582 F.2d 706, 710 n.9 (3d Cir. 1978), argues that there is no "reasonable expectation" or "demonstrated probability" that Diop will again be the subject of prolonged detention. *See Murphy v. Hunt*, 455 U.S. 478, 483 (1982). In *Murphy*, the named plaintiff brought suit under 42 U.S.C. § 1983 asserting the unconstitutionality of a Nebraska constitutional provision requiring pretrial detention without bail for those accused of sex crimes. Before the case could be heard on appeal, Murphy's trial for the underlying sex crimes ended with his conviction on three counts. Nevertheless, he argued that the

challenge to his pretrial detention was not moot because his convictions were still on appeal. The Supreme Court disagreed. It reasoned that there was no evidence in the record that his convictions would be overturned, and hence the possibility that they might be was "wholly speculative." *Id.*, 455 U.S. at 483 & n.7.

Diop is in a different situation because the prospect of his once again being detained by the Government is not wholly speculative. His case is closer to the one presented in *Frumento*, where a criminal defendant was held in contempt and imprisoned until he either complied with a court order to testify in a trial or that trial was finished. Before his appeal could be heard, the trial ended and he was released. Nevertheless, we held that his appeal was not moot for two reasons. First, he might once again be subpoenaed to give testimony at trial and, upon his refusal, would once again be held in contempt and detained; second, holding his appeal to be moot would make it impossible to evaluate the significant issues of personal liberty at stake. 552 F.2d at 540.

The Government doggedly pursued Diop's detention and removal for three years. Should the vacatur of his 1995 conviction be overturned on the ground that *Padilla* is not retroactive—a possibility that is far from remote[5]—Diop would once again be ineligible for withholding of removal and the Government's position in this appeal—that 8 U.S.C. § 1226(c) requires Diop's detention without a bond hearing— would lead it to once again place Diop in confinement. In addition, the Government's current litigating position that the vacatur is immediately effective is contrary to its position in other similar cases, *see, e.g.*, *McLeod v. Mukasey*, 287 F.

---

[5] We recently held that the Supreme Court's decision in *Padilla v. Kentucky* is retroactive. *United States v. Orocio*, --- F.3d ---, 2011 WL 2557232, at *7 (3d Cir. June 29, 2011). However, there is no judicial consensus on the issue and many lower courts have come to a contrary conclusion. *See United States v. Shafeek*, 2010 WL 3789747 (E.D. Mich. Sept. 22, 2010); *Martin v. United States*, 2010 WL 3463949 (C.D. Ill. Aug. 25, 2010); *Gacko v. United States*, 2010 WL 2076020 (E.D.N.Y. May 20, 2010).

App'x 562, 563 (9th Cir. 2008), lending further support to the conclusion that Diop's freedom is based on little more than governmental grace, subject to change at its discretion.[6] And finally, in its briefs here the Government argued that Diop could be detained on the basis of his 2005 conviction. In short, it is reasonable for Diop to fear that he might once again be the subject of lengthy removal proceedings and pre-removal detention at any time. His appeal falls into an exception to the mootness rule.

Even if Diop's case did not fall into the exception for cases capable of repetition yet evading review, we would still conclude that he maintains his standing in this appeal. In *Camreta v. Greene*, the Supreme Court held that government officials retained standing to challenge an appellate court ruling that they had violated the Fourth Amendment, even though that same court found that the government officials had immunity and, therefore, could not be ordered to pay money damages. 564 U.S ---, slip op. at 5-7. The Supreme Court reasoned that in situations where an official regularly engages in the conduct deemed unconstitutional, the judgment results in a continuing injury because the official then operates in the shadow of potential liability. "So long as [the judgment] continues in effect, [the official] must either change the way he performs his duties or risk a meritorious damages action." *Id.* at 7. "Only by overturning the ruling on appeal can the official gain clearance to engage in the conduct in the future. . . . [C]onversely, if the person who initially brought the suit may again be subject to the challenged conduct, she has a stake in preserving the court's holding." *Id.*

*Camreta* differs from this case in important respects. Here, there are no money damages at issue. Also, the District Court found that the Government's conduct did not violate the Constitution. Nevertheless, *Camreta* provides a helpful lesson in standing that is applicable to this case. Here, even without the potential for monetary damages that existed in

---

[6] This court has a longstanding policy of not citing to not-precedential decisions. We cite to *McLeod* not to make any substantive legal point, but only to show that the Government has assumed a different litigating position in similar cases.

*Camreta*, the Government and its officials retain an interest in ensuring that they operate within the bounds of the Constitution, *see id.* at 7 n.4 (explaining that government officials have a stake in the outcome of a case "independent of any future suit brought by a third party" because a ruling that its conduct is not constitutional will change their behavior).

Additionally, in this case, "the person who initially brought the suit" (Diop) "may again be subject to the challenged conduct" (prolonged pre-removal detention by ICE). Diop's newfound freedom is the fragile result of several precarious conditions. First, if the vacatur of his 1995 conviction is overturned on appeal, Diop would once again be subject to mandatory detention by ICE. Second, the Government's consistent position throughout this appeal has been that Diop's detention is required not only because of his 1995 drug conviction, but also because of his 2005 conviction for recklessly endangering another person. (Respondent-Appellee's Answ. Br. 16 n.8; Respondent-Appellee's Resp. to Brief for *Amici Curiae* 27). That 2005 conviction has not been vacated, which means that Diop "may again be subject to the challenged conduct" and hence continues to have "a stake in preserving the court's holding." *Camreta*, 564 U.S. ---, slip op. at 7. The Government has, for over three years, zealously guarded its power to detain Diop while pursuing its removal case against him; as explained above, the record provides a strong basis for the conclusion that Diop may again be subject to detention.

The issues raised in Diop's appeal are capable of repetition and are the kinds of issues that would almost always evade review by this court. Moreover, under *Camreta*, he retains an interest in this appeal despite his release. For these reasons, we conclude that there is a case or controversy over which we must exercise jurisdiction.

III.

We liberally construe Diop's *pro se* petition for writ of habeas corpus and his appellate briefs to argue that his detention cannot be authorized by 8 U.S.C. § 1226(c) because (1) neither his 1995 nor his 2005 convictions provide a basis for detaining him under the statute; and (2) even if they do

provide such a basis, any purported authority to detain him for a prolonged period of time without a bond hearing would be unconstitutional. The Government resists each of these conclusions.

A.

We begin with the argument that neither of Diop's prior criminal convictions authorizes his detention because, if they do not, then his detention is unlawful independent of any constitutional concerns. *See Doe v. Pennsylvania Bd. Of Probation and Parole*, 513 F.3d 95, 102 (3d Cir. 2008) ("As a first inquiry, we must avoid deciding a constitutional question if the case may be disposed of on some other basis.").

Section 236(a) of the IIRIRA, now codified at 8 U.S.C. § 1226(a), provides that "on a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."[7] The statute then authorizes the Attorney General to release an alien on bond "except as provided in subsection (c)." Subsection (c), in turn, states that "[t]he Attorney General *shall* take into custody," "when released" following his sentence, "any alien who . . . is deportable by reason of having committed," among other crimes, one "involving moral turpitude" or one "relating to a controlled substance." 8 U.S.C. § 1226(c) (emphasis added) (cross-referencing 8 U.S.C. § 1227(a)(2)(A)(i), for crimes involving moral turpitude and § 1227(a)(2)(B) for crimes relating to a controlled substance).

Subsection (a) of this statute expressly provides that the Attorney General "may release the alien on bond" pending a decision as to whether that alien is to be removed. 8 U.S.C. § 1226(a). Subsection (c) contains no such language. Instead, it says that aliens detained under that subsection may be released only if the Attorney General

---

[7] The Homeland Security Act of 2002 transferred most of the Attorney General's immigration-related responsibilities to the newly formed Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); *Alli v. Decker*, --- F.3d ---, 2011 WL 2450967, at *1 n.2 (June 21, 2011).

14

decides that they should be part of the federal witness protection program. 8 U.S.C. § 1226(c)(2).

Diop asserts that his 1995 conviction for possessing a controlled substance cannot be the basis of his detention under the authority of § 1226(c) because he was not taken into custody "when released" for that offense; and his 2005 conviction is no reason to detain him without bond because that conviction is not one involving moral turpitude. The Government ignores Diop's argument regarding his 1995 conviction and instead relies on the assertion that the 2005 conviction is one involving moral turpitude. (Respondents'- Appellees' Answering Br. 16 n.8).

The dispute over whether Diop's conviction is, as a definitive legal matter, one involving moral turpitude, is irrelevant. If the statute required certitude that an alien was deportable before that alien could be detained, then no alien could ever be detained because the question of removability cannot be answered until after proceedings in the immigration courts are resolved. The appropriate question is whether applicable regulations, and interpretations of the governing statutes by the BIA, allow ICE to detain Diop with some level of suspicion, but no definitive legal conclusion, that he is covered by § 1226(c). They do. According to the regulations and the commentary accompanying them, an authorized ICE agent may detain an alien if there is "reason to believe that this person was convicted of a crime covered by the statute." 63 Fed. Reg. 27444; 8 C.F.R. § 236.1; *In re Joseph I*, 22 I. & N. Dec. 660, 668 (B.I.A. 1999). Immigration judges then have the authority to review the ICE agent's initial determination that a person is subject to detention at a *Joseph* hearing. *See In re Joseph II*, 22 I. & N. Dec. 799, 800 (B.I.A. 1999); *see also Demore*, 538 U.S. at 514 n.3 (explaining that a *Joseph* hearing gives an alien the opportunity to avoid mandatory detention by establishing that he is not an alien, was not convicted of a crime requiring mandatory detention, or is otherwise not subject to mandatory detention). Because neither party attacks the constitutionality of these regulations, or the BIA's interpretation of the applicable statutes, we will assume, without deciding, that they are valid and that they authorize Diop's pre-removal detention because "there is reason to believe"—even if we do not know for sure—that

the 2005 conviction was for a crime involving moral turpitude.[8]

## B.

The Government asserts that § 1226(c) says that aliens can be detained for as long as removal proceedings are "pending," even if they are "pending" for prolonged periods of time. (Respondents'-Appellees' Answ. Br. at 17). Diop counters that his detention is unlawful because § 1226(c) does not authorize prolonged detention without a bond hearing. In support, amicus ACLU notes that courts interpret statutes with the presumption that Congress does not intend to pass unconstitutional laws. For this reason, "it is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, . . . [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). Applying this principle to § 1226(c), we conclude that the statute implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community.

## 1.

Our Constitution forbids the Government from depriving "any person" of "life, liberty, or property without due process of law." U.S. Const. amend. V. This Due

---

[8] Because the Government relies solely on the 2005 conviction for its authority to detain Diop, we do not reach the issue of whether he can be detained because of his 1995 conviction. In addition, because the parties do not question the constitutional adequacy of a *Joseph* hearing, we decline to address it here. We note, however, that the issue is an open one, *see Demore v. Kim*, 538 U.S. 510, 514 n.2 (2003), and that at least one circuit judge has expressed grave doubts as to whether *Joseph* is consistent with due process of law, *see Tijani v. Willis*, 430 F.3d 1241, 1244 (9th Cir. 2005) (Tashima, J., concurring).

Process Clause refers to "any person," which means that aliens, no less than native-born citizens, are entitled to its protection. *Zadvydas v. Davis*, 533 U.S. at 693. Thus, § 1226(c) raises a serious risk of running afoul of this command unless it is premised on a "sufficiently strong special justification." *Id.* at 690.

The Supreme Court has concluded that it is, at least on its face. Reading through the legislative history in *Demore v. Kim*, the Supreme Court noted that Congress was concerned with the immigration authorities' "wholesale failure" to "deal with the increasing rates of criminal activity by aliens." 538 U.S. at 518. Section 1226(c) was intended to remedy this perceived problem by ensuring that aliens convicted of certain crimes would be present at their removal proceedings and not on the loose in their communities, where they might pose a danger. *Demore*, 538 U.S. at 519; *id.* at 531 (Kennedy, J., concurring).

The Supreme Court's opinion emphasized Congress's broad power to pass laws relating to immigration. *Id.* at 521 ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." (quoting *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976))). It reasoned that, although Congress's powers are limited by the Due Process Clause, aliens' due process rights are not necessarily violated when they are initially detained without a specific, individualized, finding that a particular alien poses a flight risk or a risk of danger to the community. *Id.* at 523-34 (citing *Carlson v. Landon*, 342 U.S. 524 (1952)).

Justice Kennedy concurred in the Supreme Court's opinion, but highlighted an important limitation on the scope of its holding. In his view, Congress's broad immigration powers allow it to pass a law authorizing an alien's initial detention, so long as those implementing the statute provide individualized procedures through which an alien might contest the basis of his detention—a requirement satisfied in *Demore* when the petitioner, Hyung Joon Kim, received a *Joseph* hearing. *Id.* at 532. Critically, Justice Kennedy added that even if an alien is given an initial hearing, his detention might still violate the Due Process Clause if "the continued

17

detention became unreasonable or unjustified." *Id.* "Were there to be an unreasonable delay by the [Immigration and Naturalization Services ("INS")][9] in pursuing and completing deportation proceedings, it would become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532-33.

Justice Kennedy's opinion provides helpful guidance on how to interpret the *Demore* opinion. Under the Supreme Court's holding, Congress did not violate the Constitution when it authorized mandatory detention without a bond hearing for certain criminal aliens under § 1226(c). This means that the Executive Branch *must* detain an alien at the beginning of removal proceedings, without a bond hearing— and may do so consistent with the Due Process Clause—so long as the alien is given some sort of hearing when initially detained at which he may challenge the basis of his detention. However, the constitutionality of this practice is a function of the length of the detention. At a certain point, continued detention becomes unreasonable and the Executive Branch's implementation of § 1226(c) becomes unconstitutional unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community.[10]

---

[9] The responsibilities of the INS were assumed by three different agencies—ICE, Customs and Border Protection, and Citizenship and Immigration Services—within DHS when Congress passed the Homeland Security Act of 2002. *See Lin-Zheng v. Attorney General*, 557 F.3d 147, 152 n.4 (3d Cir. 2009) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002)).

[10] Although it did not frame the issue this way, we read Justice Kennedy's decision to uphold the statute on its face, while leaving open the possibility that it might be unconstitutional as applied. In other words, Congress did not violate the Constitution when it passed the law, but the Executive Branch might violate the Constitution in individual circumstances depending on how the law is applied. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*,

This will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances. We decline to establish a universal point at which detention will always be considered unreasonable. [11]

The Supreme Court's opinion in *Carlson v. Landon*, 342 U.S. 524 (1952), does not conflict with the result we reach in this case.[12] According to *Demore*, *Carlson* held that it was constitutional to detain the aliens in that case—deemed deportable because of their participation in Communist activities—without an individualized determination of their dangerousness or their likelihood of flight. 538 U.S. at 524. However, this reading of *Carlson*—permitting an alien to be initially detained without an individualized hearing—is consistent with Justice Kennedy's view that, at some point past this initial period, detention can become unreasonable, and hence unconstitutional, unless there is an individualized inquiry into whether detention advances the purposes of the statute.

For the same reason, we conclude that the Supreme Court's holding in *Reno v. Flores*, 507 U.S. 292 (1993), does not control the outcome of this case. There, a class of alien

---

62 Stan. L. Rev. 1209, 1230-35 (2010) (describing "as applied" and facial challenges in this manner).

[11] In this regard, we note that our decision today differs from our prior decision in *Patel v. Zemski*, 275 F.3d 299 (3d Cir. 2001), which was overruled by the Supreme Court in *Demore*. *See Demore*, 538 U.S. at 516. *Patel*'s holding was much broader. In *Patel*, this Court held that §1226(c) was unconstitutional in *all* circumstances unless *all* aliens detained pursuant to that statute received an individualized bond hearing. Our much narrower holding today, by contrast, is that the statute is only unconstitutional when it is applied to detain someone for an unreasonable length of time without further individualized inquiry into whether detention is necessary to carry out the purposes of the statute.

[12] The parties do not address the substance of this decision in their briefs. However, as binding Supreme Court precedent, we are required to address it.

19

juveniles argued that it was unconstitutional for the immigration authorities to detain juveniles and release them only into the care of a parent, legal guardian or other specified adult relative. The Supreme Court upheld the constitutionality of the detention. However, the detention in that case was not mandatory. Moreover, just like *Carlson*, a reading of *Flores* that purported to uphold detention for an unreasonable length of time without further individualized inquiry would be contrary to Justice Kennedy's concurrence in *Demore*.

In short, when detention becomes unreasonable, the Due Process Clause demands a hearing, at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute.

2.

This leaves us with the question of whether Diop's prolonged detention in this case was unconstitutionally unreasonable and, therefore, a violation of the Due Process Clause. We conclude that it was. *Demore* emphasized that mandatory detention pursuant to § 1226(c) lasts only for a "very limited time" in the vast majority of cases. 538 U.S. at 529 & n.12. In fact, *Demore* relied on statistics showing that detention under § 1226(c) "lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which an alien chooses to appeal." *Id.* at 530. This leads us to believe that the result may well have been different had the petitioner in *Demore* been detained for significantly longer than the average. Indeed, the petitioner in *Demore* had been detained for only slightly longer than the average (6 months) when his habeas petition was decided. Assuming, without deciding, that this was a presumably reasonable period of detention, and comparing it to Diop's 35 months of detention, which was nearly six times longer, leads us to conclude that Diop's detention, without any post-*Joseph* hearing inquiry into whether it was necessary to accomplish the purposes of § 1226(c), was unreasonable.

The Government argues that there was no "unreasonable delay" in Diop's proceedings because he was

given continuances to find an attorney, to draft an application for asylum and withholding of removal, and because he took several appeals. Diop responds that the delay is attributable to the immigration judge's continued errors, which necessitated the appeals and remands. We agree with the Government that the reasonableness determination must take into account a given individual detainee's need for more or less time, as well as the exigencies of a particular case. But we also conclude that reasonableness must take into account errors in the proceedings that cause unnecessary delay. No system of justice can be error-free, and those errors require time to fix. Nevertheless, in this case the immigration judge's numerous errors, combined with the Government's failure to secure, at the earliest possible time, evidence that bore directly on the issue of whether Diop was properly detained, resulted in an unreasonable delay.

We cannot simply rely on the Government's determination of what is reasonable. Although judicial deference to the Executive Branch in the immigration context is "of special importance" because officials "exercise especially sensitive political functions that implicate questions of foreign relations," *Negusie v. Holder*, 129 S. Ct. 1163-64 (2009), courts reviewing petitions for writ of habeas corpus must exercise their independent judgment as to what is reasonable, *see Zadvydas*, 533 U.S. at 699 ("Whether a set of particular circumstances amounts to detention within, or beyond, a period reasonably necessary to secure removal is determinative of whether the detention is, or is not, pursuant to statutory authority. The basic federal habeas corpus statute grants the federal courts authority to answer that question."). In *Zadvydas*, the Supreme Court adopted a presumption that six months of detention pursuant to the post-removal statute was reasonable. It reasoned that Congress had previously doubted the constitutionality of detention for longer than this period and observed that such a six-month window would free the Executive Branch from excessive interference by the judiciary. Amicus ACLU urges us to adopt a similar position in this case. We decline to adopt such a one-size-fits-all approach. Reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case. That being said, we note that the reasonableness of any given detention pursuant to §

1226(c) is a function of whether it is necessary to fulfill the purpose of the statute, and, given that Congress and the Supreme Court believed those purposes would be fulfilled in the vast majority of cases within a month and a half, and five months at the maximum, *see Demore*, 538 U.S. at 530, the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds. In this case, there can be no question that Diop's detention for nearly three years without further inquiry into whether it was necessary to ensure his appearance at the removal proceedings or to prevent a risk of danger to the community, was unreasonable and, therefore, a violation of the Due Process Clause.

3.

It was unconstitutional to detain Diop for nearly three years under the authority granted by Congress in § 1226(c). Nevertheless, "if Congress has made its intent in the statute clear, we must give effect to that intent." *Zadvydas*, 533 U.S. at 696 (internal quotation marks omitted). We do not believe that Congress intended to authorize prolonged, unreasonable, detention without a bond hearing. For one, the parties have not provided any legislative history in support of such a conclusion. Furthermore, in *Demore*, the Supreme Court observed that Congress directed the INS to "complete removal proceedings against [criminal aliens] as promptly as possible." 538 U.S. at 530 n.13. This, combined with statistics showing that detention is often for only a brief period of time, leads us to believe that Congress did not intend to authorize prolonged detention pursuant to § 1226(c) without, at some point, requiring further inquiry into whether detention is necessary to carry out that statute's purpose. Accordingly we conclude that § 1226(c) contains an implicit limitation of reasonableness: the statute authorizes only mandatory detention that is reasonable in length. After that, § 1226(c) yields to the constitutional requirement that there be a further, individualized, inquiry into whether continued detention is necessary to carry out the statute's purpose. *Cf. Zadvydas*, 533 U.S. at 682, 699 (reading § 1231 to contain an implicit "reasonable time" limitation on the length of post-removal detention).

## IV.

Diop maintains a reasonable expectation that he may, once again, find himself imprisoned while the authorities sort through the complicated laws and procedures governing the removal of criminal aliens. Should he be detained once again, our holding provides that he may only be detained for a reasonable length of time. Should the length of his detention become unreasonable, the Government must justify its continued authority to detain him at a hearing at which it bears the burden of proof. For all of the foregoing reasons, we will vacate the District Court's decision and order dismissing Diop's petition for Writ of Habeas Corpus.