PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

───────────

No. 17-2814

───────────

IGOR V. BORBOT,

Appellant

v.

WARDEN HUDSON COUNTY CORRECTIONAL
FACILITY

───────────

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:17-cv-04646)
District Judge: Honorable Jose L. Linares

───────────

Argued March 21, 2018
Before: SMITH, *Chief Judge*, HARDIMAN, and ROTH,
*Circuit Judges*.

(Filed: October 16, 2018)

Simone Bertollini [Argued]
609 North Franklin Avenue, Suite 2120
Nutley, NJ 07110

Paul F. O'Reilly
450 Seventh Avenue, Suite 1408
New York, NY 10123
        *Attorneys for Appellant*

Chad A. Reader
William C. Peachey
Kathleen A. Connolly
Genevieve Kelly [Argued]
United States Department of Justice
Office of Immigration Litigation
450 5th Street, N.W.
Washington, D.C. 20001
        *Attorneys for Appellee*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

Igor Borbot, a native and citizen of Russia, has been detained at the Hudson County Correctional Facility pending removal proceedings since April 2016. Fourteen months after he was denied release on bond, Borbot petitioned the United States District Court for the District of New Jersey for a writ of habeas corpus under 28 U.S.C. § 2241. Borbot alleged that the Due Process Clause of the Fifth Amendment entitled him to a new bond hearing at which the government would bear

2

the burden of justifying his continued detention. The District Court dismissed Borbot's petition, and he filed this appeal.

I

Borbot entered the United States in September 2014 on a six-month tourist visa, which he overstayed. Nearly a year later, an Interpol Red Notice requested by Russia identified Borbot as a fugitive wanted for prosecution on criminal fraud charges. On April 22, 2016, Immigration and Customs Enforcement (ICE) detained Borbot under 8 U.S.C. § 1226(a) and initiated removal proceedings, which are still pending in immigration court in New York.

Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). The relevant implementing regulations state that a detainee under § 1226(a) may be released on bond by ICE or by an immigration judge (IJ) if the detainee "demonstrate[s] . . . that such release would not pose a danger to property or persons, and that [he] is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8). If denied release at the initial bond hearing, a § 1226(a) detainee may request a custody redetermination hearing before an IJ. *Id.* § 236.1(d)(1). That request will "be considered only upon a showing that the alien's circumstances have changed materially." *Id.* § 1003.19(e). Both the initial bond determination and subsequent custody decisions can be appealed to the Board of Immigration Appeals (BIA). *Id.* § 236.1(d)(3).

Shortly after his arrest, Borbot applied for release on bond. An IJ denied his application after a hearing, finding that

3

Borbot failed to meet his "burden in establishing [that] he does not pose a risk of danger to property." App. 80 (citing *Matter of Urena*, 25 I & N Dec. 140, 141 (BIA 2009)). Borbot appealed the IJ's decision to the BIA, arguing that the IJ "gave too much weight to his pending criminal charges in Russia" and that the charges were pretextual and "lodged in retaliation for [Borbot's] political opposition to . . . Vladimir Putin." App. 76. The BIA upheld the IJ's decision, explaining that "an alien in bond proceedings is not entitled to the benefit of the doubt when it comes to evidence of potential dangerousness." *Id.* Borbot later requested a redetermination hearing, which the IJ denied on April 13, 2017, finding that there had been no material change in circumstances.

About three months later, Borbot filed in the District Court a petition for writ of habeas corpus under 28 U.S.C. § 2241, alleging that his continued detention deprived him of due process unless the government could show "clear and convincing evidence of risk of flight or danger to the community." App. 24 (citations omitted). On July 19, 2017, nearly 15 months after Borbot's arrest, the District Court dismissed his petition as facially insufficient, concluding that Borbot was not entitled to a new bond hearing unless he could show that he was denied due process in his initial hearing, which he did not attempt to do. Borbot timely appealed.[1]

---

[1] The District Court also dismissed two other claims in Borbot's petition, one challenging the IJ's weighing of evidence and the other alleging that Borbot's continued detention prevented him from communicating with his attorneys in Russia. Borbot does not appeal the dismissal of those claims.

## II

The District Court had jurisdiction under 28 U.S.C. § 2241. We have jurisdiction under 28 U.S.C. § 1291. Because the District Court dismissed Borbot's petition without holding an evidentiary hearing, our review is plenary. *See Fahy v. Horn*, 516 F.3d 169, 179 (3d Cir. 2008); *see also Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003) (reviewing de novo whether an alien's due process rights were violated).

## III

"[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). The Supreme Court has repeatedly recognized that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521 (2003) (citation omitted). At the same time, the Court has found limits on that power. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (concluding that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem").

The duration of Borbot's detention is the sole basis for his due process challenge. According to Borbot, the government cannot constitutionally detain him "for over a year, or indefinitely[,] without having to prove dangerousness." Borbot Br. 3. He acknowledges that—as mandated by Congress and the Department of Homeland Security—he has received a bond hearing and an opportunity to request a redetermination hearing based on changed circumstances. He does not challenge the adequacy of his

5

initial bond hearing. Nor does he allege unreasonable delay by the government. Indeed, the conclusion of his removal proceedings—and accordingly the end of his detention— appears to be forthcoming.[2] Rather, he argues that by the time the IJ denied his request for a redetermination hearing, about a year into his detention, he was entitled to a second bond hearing, this time with the government bearing the burden of proof. But Borbot cites no authority, and we can find none, to suggest that duration alone can sustain a due process challenge by a detainee who has been afforded the process contemplated by § 1226(a) and its implementing regulations.[3]

---

[2] As Borbot's counsel noted during oral argument, the immigration court has already held two merits hearings in his removal case.

[3] Borbot's bond hearing and the lack of any allegation of unreasonable government delay distinguish his detention from the situation contemplated by Justice Kennedy in his concurring opinion in *Demore*, on which Borbot relies. In that case, the Supreme Court upheld the constitutionality of mandatory detention without a bond hearing under 8 U.S.C. § 1226(c). Justice Kennedy understood the Supreme Court's opinion to be consistent with the proposition that due process "could" entitle an alien detainee to "an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Demore*, 538 U.S. at 532 (Kennedy, J., concurring). In the event of "unreasonable delay" by the government, Justice Kennedy wrote, "it could become necessary . . . to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532–33. Borbot does not

6

Instead, Borbot draws an analogy between his detention and mandatory detention under 8 U.S.C. § 1226(c). In particular, he relies on two cases in which this Court held that aliens detained under § 1226(c) were entitled to a bond hearing if their detention became unreasonably long: *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011) and *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469 (3d Cir. 2015). Because of the differences between mandatory detention under § 1226(c) and detention under § 1226(a), however, Borbot's analogy is inapt.

In contrast to the bond hearing and subsequent process afforded to § 1226(a) detainees like Borbot, Congress in § 1226(c) defined certain categories of aliens for whom detention is mandatory and release is authorized only in narrow circumstances. Under § 1226(c), "[t]he Attorney General shall take into custody any alien" who is inadmissible or deportable on the basis of enumerated categories of crimes and terrorist activities. 8 U.S.C. § 1226(c)(1). By its terms, § 1226(c) does not entitle detainees to a bond hearing. Release is authorized "only if the Attorney General decides . . . that release of the alien from custody is necessary" for witness-protection purposes "and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." *Id.* § 1226(c)(2).

---

attempt to show unreasonable delay, and unlike the petitioner in *Demore*, he has received an individualized determination as to the necessity of his detention.

7

In *Diop*, we considered whether a petitioner was entitled to a bond hearing nearly three years into his detention under § 1226(c). 656 F.3d at 223–26. We held that he was, notwithstanding that provision's lack of any such requirement. "[W]hen detention becomes unreasonable," we reasoned, "the Due Process Clause demands a hearing, at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute." *Id.* at 233. We noted that in rejecting a due process challenge by a § 1226(c) detainee in *Demore*, the Supreme Court emphasized that "mandatory detention pursuant to § 1226(c) lasts only for a 'very limited time' in the vast majority of cases," and concluded that the result in that case "may well have been different" if the petitioner's detention had been "significantly longer than the average." *Diop*, 656 F.3d at 233–34 (quoting *Demore*, 538 U.S. at 529 & n.12). We therefore interpreted § 1226(c) to "contain[] an implicit limitation of reasonableness: the statute authorizes only mandatory detention that is reasonable in length." *Id.* at 235. Beyond that point—which can be determined only by a "fact-dependent inquiry," *id.* at 233—the statute "yields to the constitutional requirement that there be a further, individualized, inquiry into whether continued detention is necessary to carry out the statute's purpose," *id.* at 235. Our interpretation of § 1226(c) relied in part on *Zadvydas*, in which the Supreme Court "read an implicit limitation into" 8 U.S.C. § 1231(a)(6)—which governs detention of aliens who have already been ordered removed—so that it "d[id] not permit indefinite detention." 533 U.S. at 689.

We applied *Diop*'s reasonableness requirement in *Chavez-Alvarez*. There, we held that because the petitioner's year-long detention under § 1226(c) had become

8

unreasonable, he was entitled to a bond hearing where the government would bear the burden of "produc[ing] individualized evidence that Chavez–Alvarez's continued detention was or is necessary." *Chavez-Alvarez*, 783 F.3d at 474, 478. As in *Diop*, that conclusion resulted from our "use of a balancing framework [that] makes any determination on reasonableness highly fact-specific." *Id.* at 474.

The Supreme Court recently overruled *Diop*'s interpretation of 8 U.S.C. § 1226(c). In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Court rejected our conclusion that § 1226(c) contains an implicit reasonableness limitation. *Id.* at 846–47. The Court noted that in *Demore*, it distinguished § 1226(c) from § 1231(a)(6) (the statute at issue in *Zadvydas*). *Jennings*, 138 S. Ct. at 846. While detention under § 1231(a)(6) lacks a "definite termination point," § 1226(c) authorizes detention only until the conclusion of removal proceedings. *Id.* (quoting *Demore*, 538 U.S. at 529). The Court held in *Jennings* that "§ 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings *only* if the alien is released for witness-protection purposes." *Id.* at 847 (emphasis added) (internal quotation marks omitted). *Jennings* did not, however, address the constitutionality of § 1226(c), instead remanding to the Ninth Circuit to decide that question in the first instance. *Id.* at 851. Accordingly, *Jennings* did not call into question our constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long.

Contrary to Borbot's suggestion, however, the reasonableness inquiry we performed in *Diop* and *Chavez-Alvarez* is inappropriate in the context of § 1226(a). We held in those cases that due process entitles § 1226(c) detainees to

9

a bond hearing at some point, with the exact time varying with the facts of the case. As noted, however, Borbot was afforded a prompt bond hearing, as required by § 1226(a) and its implementing regulations. He appealed the rejection of his application for release to the BIA and was given an opportunity to obtain a redetermination hearing if he could show materially changed circumstances. Unlike § 1226(c) detainees such as Diop and Chavez-Alvarez, who were detained for prolonged periods without being given any opportunity to apply for release on bond, Borbot was granted meaningful process prior to filing his habeas petition.[4]

---

[4] Borbot notes that in *Diop*, we read Justice Kennedy's concurrence in *Demore* to suggest that "even if an alien is given an initial hearing, his detention might still violate the Due Process Clause" if it becomes unreasonably long. 656 F.3d at 232. The "initial hearing" at issue in those § 1226(c) cases, however, was not a bond hearing, but rather the *Joseph* hearing at which § 1226(c) detainees are permitted to demonstrate that they are not subject to mandatory detention. *See Diop*, 656 F.3d at 232; *see also Demore*, 538 U.S. at 532 (Kennedy, J., concurring) (citing *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999)). Justice Kennedy's suggestion that there may be due process limits on detention under § 1226(c) even after a *Joseph* hearing does not apply to § 1226(a) detentions following a *bond* hearing. Whereas a *Joseph* hearing is unrelated to the detention itself—it is limited to whether § 1226(c) applies at all, *see Matter of Joseph*, 22 I. & N. Dec. at 800—the bond hearing Borbot received and the IJ's consideration of his request for a redetermination hearing were expressly for the purpose of determining whether his continued detention was necessary.

Borbot complains that he has borne the burden of proof throughout his detention. The burden must eventually shift to the government, he argues, regardless of the process he was initially afforded under § 1226(a). Borbot is correct to point out that *Diop* places the burden of proof on the government in § 1226(c) cases, whereas under § 1226(a) the burden remains on the detainee at all times. But we perceive no problem with this distinction. Borbot claims the government could avoid ever bearing the burden of proof by "simply detain[ing] criminal aliens" pursuant to § 1226(a) even though they are subject to mandatory detention under § 1226(c). Borbot Br. 10. We do not share this concern, because § 1226 affords the government no such discretion. *See* 8 U.S.C. § 1226(c) (providing that "[t]he Attorney General *shall* take into custody *any alien*" who falls under certain enumerated categories (emphasis added)). Nor does the distinction run afoul of the Equal Protection Clause, as Borbot suggests, because § 1226(a) detainees are not situated similarly to § 1226(c) detainees, much less to § 1226(c) detainees who have been detained for years without any opportunity to show why they should be released.

The distinction we draw today between § 1226(a) and § 1226(c) detainees is further supported by the statutory scheme applicable to removal. Section 1226(e) provides that "[t]he Attorney General's discretionary judgment regarding [bond hearings for aliens in removal proceedings] shall not be subject to review" and that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e). Because Borbot does not challenge a particular action or decision, but rather "the statutory framework that permits his

11

detention without bail," *Demore*, 538 U.S. at 517, § 1226(e) does not deprive the District Court or this Court of jurisdiction over Borbot's petition. But unlike the § 1226(c) context, in which a habeas petition seeks to compel a bond hearing where there has been none, Borbot's habeas petition seeks to compel a *second* bond hearing despite alleging no constitutional defect in the one he received. This comes close to asking this Court to directly review the IJ's bond decision, a task Congress has expressly forbidden us from undertaking.[5]

We recognize Borbot's concern that, despite an initial bond hearing, detention under § 1226(a) might become unreasonably prolonged, whether by virtue of government delay or some other cause. But Borbot fails to identify a basis in the record to demonstrate that this is such a case. We therefore need not decide when, if ever, the Due Process Clause might entitle an alien detained under § 1226(a) to a

---

[5] Although Borbot's argument is constitutional rather than statutory, we note that the Supreme Court in *Jennings* rejected an interpretation of § 1226(a) that included implicit time limits and a shifting burden of proof. *See* 138 S. Ct. at 847–48 ("Nothing in § 1226(a)'s text—which says only that the Attorney General 'may release' the alien 'on . . . bond'— even remotely supports the imposition of those requirements. Nor does § 1226(a)'s text even hint that the length of detention prior to a bond hearing must specifically be considered in determining whether the alien should be released." (ellipsis in original)).

new bond hearing in order to conclude that Borbot's due process rights were not violated.[6]

\* \* \*

For the foregoing reasons, we will affirm the District Court's order.

---

[6] By letter dated September 7, 2018, counsel for Borbot advised this Court that as of July 20, 2018, Borbot "is not subject to an INTERPOL Notice or diffusion." Nothing in this Opinion should be read to preclude Borbot from seeking reconsideration from the agency based on these changed circumstances.

13

ROTH, Senior Judge, dissenting:

The judicial branch of our federal government should be sheltered from the political maneuverings of foreign nations. These matters are best left to the executive and legislative branches. Nevertheless, there are occasions when it becomes evident that the machinations of a foreign government have, inadvertently to the courts, become entangled in the judicial process.

This case is an example of such a situation. It has become clear that the Russian government has been employing Interpol alerts or "Red Notices" to pursue and harass opponents of the Russian regime. *See, e.g., The Atlantic*, July 30, 2018; *The Atlantic*, May 30, 2018; *The New York Times*, November 6, 2016; *The Globe and Mail*, September 25, 2015. A member country of Interpol, such as Russia, can request that Interpol issue an arrest warrant to aid in capturing a fugitive. Interpol will then issue a Red Notice and, on the basis of that notice, the fugitive can be arrested by the authorities in another member country where the fugitive may be located. This is designed to be an important tool in fighting crime. It is a tool, however, that has been misappropriated by the Russian government to punish political opponents who travel abroad.

Opponents of the present Russian regime have been arrested in countries around the world on the basis of a Red Notice. They then have had extreme difficulty in convincing the authorities of the arresting countries that they are not criminals but are being pursued by the Russian government for political reasons.

1

The petitioner here claims that he is not a criminal. He has no criminal record anywhere. He was arrested by ICE for overstaying his visa. Then, on the basis of an Interpol Red Notice, requested by Russia, he has been held in custody since April 22, 2016, on the ground that he is a danger to the community. The reason for being classified as a danger is the Red Notice, nothing else. We have just learned that as of July 28, 2018, Interpol withdrew the Red Notice on Borbot. Nevertheless, Borbot remains in custody at least until there is a new ruling on danger to the community by the BIA.

To obtain the Red Notice, Russia charged Borbot with fraud. Borbot has demonstrated that the "fraud," an alleged overcharging on a shipyard construction contract, was baseless and politically motivated. He has applied for political asylum. Moreover, there was a civil suit brought against Borbot in a Russian court on the basis of the same shipyard overcharges. The suit was dismissed as groundless and the dismissal was affirmed.

It is contrary to my concept of justice to hold in custody an individual who is the innocent victim of a rogue foreign government. For that reason, I would recommend that a new hearing be held by the IJ to review the finding of "danger to the community." Such a review is necessary to prevent a foreign government from improperly influencing our immigration courts.