# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON REMAND

## NO. 03-18-00261-CV

**Texas Department of Family and Protective Services; Stephanie Muth,
in Her Official Capacity as DFPS Commissioner; Texas Health and Human Services;
Cecile Erwin Young, in Her Official Capacity as HHSC Executive Commissioner;
Corrections Corporation of America; and The GEO Group, Inc., Appellants[1]**

**v.**

**Grassroots Leadership, Inc.; Gloria Valenzuela; E.G.S., for herself and
as next friend for A.E.S.G.; F.D.G., for herself and as next friend for N.R.C.D.;
Y.E.M.A., for herself and as next friend for A.S.A., Appellees**

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-15-004336, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## O P I N I O N

This cause returns to us on remand from the Texas Supreme Court. *See Grassroots Leadership, Inc. v. Texas Dep't of Fam. & Protective Servs.*, 646 S.W.3d 815, 821 (Tex. 2022) (per curiam). In our prior review of this cause, we determined that the plaintiffs—including individuals previously detained in two Texas immigration detention centers—did not have standing to challenge a rule promulgated by the Texas Department of Family and Protective

---

[1] Pursuant to Rule 7.2 of the Texas Rules of Appellate Procedure, the current commissioners of the relevant agencies have been automatically substituted for the agencies' former commissioners.

Services and we therefore did not reach the merits of the plaintiffs' claims. *See Texas Dep't of Fam. & Protective Servs. v. Grassroots Leadership*, No. 03-18-00261-CV, 2018 WL 6187433, at *7 (Tex. App.—Austin Nov. 28, 2018) (mem. op.), *rev'd*, 646 S.W.3d at 821. The supreme court reversed our judgment, determining that the former detainees have standing to challenge the rule, and remanded to us "for consideration of the remaining jurisdictional issues and the merits, as appropriate." *Grassroots Leadership*, 646 S.W.3d at 821. On remand, we will reverse and vacate the trial court's final judgment as to part of the injunctive relief, but otherwise affirm the remainder of the trial court's final judgment.

## BACKGROUND

While the factual and procedural background of this dispute is outlined in depth in the supreme court's opinion, *see id.* at 818–19, we recount it briefly as necessary to frame the issues before us.

In this lawsuit, the plaintiffs—mothers and their children detained at two Texas immigration detention centers, a day-care operator, and an organization representing the detainees' interests—challenge a Department[2] licensing rule governing immigration detention centers. The private prison companies operating the detention centers, known as the Dilley and Karnes centers, intervened as defendants.

In 2014, U.S. Immigration and Customs Enforcement (ICE) began to detain undocumented families with children at Dilley and Karnes. In 2015, a federal court enjoined the facilities from detaining the families, finding that they lacked appropriate child-care licenses and

---

[2] At the time of trial, Chapter 42 of the Texas Human Resources Code gave the Department child-care-licensing authority. Since then, statutory restructuring has given that oversight to the Texas Health and Human Services Commission, also a party to this lawsuit.

had violated a federal consent decree requiring that such facilities be state-licensed when housing detained minors. *Flores v. Johnson*, 212 F. Supp. 3d 864, 877–80 (C.D. Cal. 2015), *aff'd in relevant part sub nom. Flores v. Lynch*, 828 F.3d 898, 908–10 (9th Cir. 2016).

The Department then promulgated a rule, first on an emergency basis and then formally, establishing licensing requirements for what it defined as "family residential centers" (FRCs) and designating FRCs as a type of general residential operation (GRO) that "must comply with all associated requirements for GROs" except for certain variances, including those provided for in the rule. *See* 26 Tex. Admin. Code § 748.7 (2022) (Tex. Health & Hum. Servs. Comm'n, How are these regulations applied to family residential centers?) (the FRC Rule). Among those variances, and to allow Dilley and Karnes to house families together, the FRC Rule eliminated a provision in state regulations (the so-called "Minimum Standards") prohibiting the housing of adults and children in the same bedroom except in narrow circumstances.[3] *See Grassroots Leadership*, 646 S.W.3d at 818.

The plaintiffs allege that Dilley and Karnes have permitted unrelated adults to share bedrooms with children in reliance on the FRC Rule, that one minor child was sexually assaulted while sharing her room with an unrelated adult, and that the FRC Rule has resulted in longer detention periods[4] at the centers, which harms children. They sought a permanent

---

[3] Since plaintiffs filed suit, the Minimum Standards have been amended to allow children to share bedrooms with parents and adult siblings. *See* 26 Tex. Admin. Code § 748.1937 (2022) (Tex. Health & Hum. Servs. Comm'n, May an adult in care share a bedroom with a child in care?).

[4] The longer detention periods are a consequence of *Flores*'s requirement that the facilities be State-licensed because ICE is permitted to detain minors in non-licensed "safe and sanitary" facilities for no more than five days after arrest, except "in the event of an emergency or influx of minors into the United States." *See Flores v. Lynch*, 828 F.3d 898, 902–03 (9th Cir. 2016).

injunction and declaration that the FRC Rule is invalid for several reasons, including that the Department lacked statutory authority to promulgate it.

The defendants filed pleas to the jurisdiction, contending that the plaintiffs lack standing to challenge the FRC Rule. The trial court granted the jurisdictional pleas in part, dismissing the plaintiffs' claims under the Uniform Declaratory Judgments Act, but denied the pleas as to the remaining grounds. The trial court also denied the defendants' motions for summary judgment regarding the validity of the FRC Rule. In its final judgment, the trial court rendered summary judgment on the plaintiffs' claims for declaratory relief under the Administrative Procedure Act (APA), declaring the FRC Rule invalid because it "contravenes" Section 42.002(4) of the Texas Human Resources Code and "runs counter to the general objectives of the Texas Human Resources Code."

The defendants appealed, and this Court reversed the trial court's determination as to the plaintiffs' standing, thus not reaching the merits of the rule challenge. *See Grassroots Leadership*, 2018 WL 6187433, at *7. The supreme court reversed our holding as to the standing of the detainees[5] and remanded to us for consideration of the issues we did not reach. *See Grassroots Leadership*, 646 S.W.3d at 821. We therefore consider the jurisdictional issues we did not reach and, if necessary, the remaining appellate issues—including the merits of the plaintiffs' rule challenge.

---

[5] The day-care operator and Grassroots Leadership did not challenge in the supreme court this Court's ruling as to their standing.

4

**DISCUSSION**

***Whether the detainees' claims are moot***

We first consider appellants' contention, which we did not reach in our prior opinion and which is encompassed within their respective first issues, that because the detainees admittedly are no longer detained at Karnes and Dilley, this dispute has become moot. Appellants cite the general standing rule requiring an actual controversy to exist between the parties at every stage of the legal proceedings, including the appeal, and providing that if a controversy ceases to exist, the case becomes moot. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (determining that inmates' release from county jail rendered their challenge to jail conditions moot); *see also Electric Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634–35 (Tex. 2021) (listing ways that case may become moot). Mootness is a jurisdictional issue that appellate courts must consider sua sponte even if litigants do not raise it. *See State ex rel. Best v. Harper*, 562 S.W.3d 1, 7 (Tex. 2018).

Appellees respond that the detainees have been paroled or released on bond since the outset of this lawsuit, and that their bond or parole can be revoked at any time, with or without cause, *see* 8 U.S.C. § 1226(b), and therefore their claims are not moot, *see In re Hutto Fam. Det. Ctr.*, No. A-07-CA-164-SS, 2007 WL 9757682, at *2 (W.D. Tex. May 10, 2007) (holding that because detainees "ha[d] not been unequivocally released" and had been given only "discretionary parole" under Section 1226(b) that could "be revoked at any time, even if the detainee does nothing in particular to warrant revocation," they had "a continuing, vital interest in the outcome of this litigation," and their claims were not moot), *reconsideration granted on other grounds*, 2007 WL 9757682, at *1 (W.D. Tex. May 29, 2007); *see also Clark v. Martinez*, 543 U.S. 371, 376 n.3 (2005) (holding that discretionary, revocable parole release under different

5

code section did not moot detainee's claims for relief); *Rosales-Garcia v. Holland*, 322 F.3d 386, 395–96 (6th Cir. 2003) (same); *Roberts v. State*, 508 S.W.3d 310, 311 (Tex. App.—Fort Worth 2013, no pet.) (noting that because inmate's release from prison was on condition of parole, he remained in custody of Department of Criminal Justice and thus his complaint about withdrawals from his inmate trust account was not moot). But in the cases cited by appellees, the conditions under which the detainees had been released were undisputed and were made known to the court. *See Clark*, 543 U.S. at 376 n.3; *Rosales-Garcia*, 322 F.3d at 395–96; *In re Hutto Fam. Det. Ctr.*, 2007 WL 9757682, at *2; *Roberts*, 508 S.W.3d at 311.

In contrast, here—as appellants argue in their briefs—there is no evidence explaining the circumstances or conditions, if any, of the detainees' release. Evidence in the record indicates that about 97% of those detained at Karnes are "released into the community," without further explanation. Other evidence indicates that the majority of those detained at Dilley and Karnes are ultimately released—either to further pursue asylum or because they have received a favorable asylum determination. While the parties agree that detainees reside at Dilley and Karnes while under a federal deportation order, many of them file asylum claims, which are at various stages of processing during their detention. As to the specific detainees who are the plaintiffs below, appellees merely argue in their brief that "[t]hey have all since been paroled or released on bond," but they cite no evidence in the record or otherwise supporting that claim. In contrast, appellants identify undisputed evidence in the record indicating merely that the detainee appellees are no longer residents of the facilities, rendering their controversy no longer live and thus moot by definition. *See Williams*, 52 S.W.3d at 184. We therefore cannot conclude, on this record, that appellees' status is analogous to that of the detainees in *In re Hutto Family Detention Center*. *See* 2007 WL 9757682, at *2. We thus turn to appellees'

6

argument that even if their claims are moot, one of the available exceptions to the mootness doctrine applies.

The first exception they cite is known as the "capable of repetition yet evading review" exception. *See Texas A&M Univ.–Kingsville v. Yarbrough*, 347 S.W.3d 289, 290 (Tex. 2011). This "rare" exception applies only when (1) the injury is of such short duration that the plaintiff cannot obtain review before the issue becomes moot and (2) there is a reasonable expectation that the same action will occur again to the same plaintiff if the issue is not considered by the courts. *Id.*; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) ("[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality.").

We conclude that the first prong of this exception is met because the evidence establishes that the average length of detention is eleven days, a period too short to complete litigation. *See Williams*, 52 S.W.3d at 184 (holding that where plaintiff challenged conditions of pre-trial confinement, duration of confinement was too short to complete litigation and thus satisfied first prong); *Diop v. ICE*, 656 F.3d 221, 227 (3rd Cir. 2011) (holding that immigrant's claim met first prong).

As to the second prong, however, and as noted above, appellees do not cite any evidence in the record supporting their claim that these same former detainees are reasonably likely to be detained at Dilley or Karnes again. Specifically, they cite no evidence concerning the circumstances under which the detainees were released, and therefore we cannot conclude that there is more than a mere physical or theoretical possibility that they will be detained in one of these two centers—or any center—again. *See Heckman v. Williamson*

7

*County*, 369 S.W.3d 137, 165 (Tex. 2012) (noting that for "capable of repetition exception" to apply, plaintiff must show that "the claim is capable of repetition *as to him*"); *State v. City of Austin*, No. 03-20-00619-CV, 2021 WL 1313349, at \*6 (Tex. App.—Austin Apr. 8, 2021, no pet.) (mem. op.) ("The 'mere physical or theoretical possibility' that the same party may be subjected to the same action again is not sufficient to satisfy this element." (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982))). Appellees therefore have not demonstrated that their first cited mootness exception applies.

We next consider whether appellees' second asserted exception to mootness applies: the public-interest exception. This Court and some of our sister courts have recognized this exception, which expands the capable-of-repetition exception to include parties other than those involved in the current case. *City of Austin*, 2021 WL 1313349, at \*7; *see NextEra Energy, Inc. v. Public Util. Comm'n*, No. 03-19-00425-CV, 2020 WL 4929778, at \*4 (Tex. App.—Austin Aug. 21, 2020, pet. denied) (mem. op.) (recognizing availability of exception in appropriate cases); *Meeker v. Tarrant Cnty. Coll. Dist.*, 317 S.W.3d 754, 761–62 (Tex. App.—Fort Worth 2010, pet. denied) (discussing exceptions' "common element"); *Texas Dep't of Pub. Safety v. LaFleur*, 32 S.W.3d 911, 914 (Tex. App.—Texarkana 2000, no pet.) (recognizing exception and applying it in case involving revocation of concealed-handgun permit because, even though issue became moot when license expired, issue was of "considerable public interest" involving "large number of people licensed to carry guns in Texas"). The public-interest exception "allows appellate review of a question of considerable public importance if that question is capable of repetition between either the same parties or other members of the public but for some reason evades appellate review." *University Interscholastic League v. Buchanan*, 848 S.W.2d 298, 304 (Tex. App.—Austin 1993, no writ); *see also Federal Deposit Ins. Corp. v. Nueces County*,

8

886 S.W.2d 766, 767 (Tex. 1994) (recognizing that some courts of appeals have adopted exception but not reaching issue of viability of public-interest exception).

We conclude that the question of the FRC Rule's validity, including the detention-center conditions and lengthened detention periods it permits, is one of considerable importance to the public. For years federal immigration policy has been a subject of great public interest and especially so beginning in 2014 when ICE began detaining all undocumented female-headed families. *See Flores*, 212 F.Supp.3d at 869; *see also Flores*, 828 F.3d at 901 (noting that issues underlying appeal—whether Dilley and Karnes had violated *Flores* consent decree—"touch on matters of national importance"). Evidence in the record demonstrates that Dilley and Karnes have detained thousands of immigrants, including children, with more than 5,000 new people detained at Dilley in the month of September 2016 alone. Further, the well-being and safety of children, in and of itself, is an issue of considerable public interest, *see In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (recognizing state's duty to protect safety and welfare of children); *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287, 291–92 (Tex. 1996) (recognizing legislature's strong policy and public interest in protecting children from abuse), and the record contains evidence of at least one child's being groped at Karnes by an unrelated adult with whom she was sharing a bedroom per the FRC Rule's exceptions to the Minimum Standards. It also contains evidence of the trauma and psychological harm that children suffer from being in detention centers, which harm would presumably increase by virtue of the longer detention periods that licensing of the facilities under the FRC Rule would allow.

We have already determined that detention periods at Dilley and Karnes are generally of such short duration as to evade appellate review of the challenged conditions there, which stem from the FRC Rule, and it is reasonably foreseeable that future detainees will

9

experience the effects of the FRC Rule while detained at Dilley and Karnes. For these reasons, we hold that the public-interest exception applies to the plaintiffs' claims, and therefore this dispute is not moot. *See Buchanan*, 848 S.W.2d at 304. We accordingly turn to the merits of appellees' rule challenge.

***Whether the trial court properly determined that the FRC Rule is invalid***

In their respective second issues, appellants contend that the trial court improperly determined that the FRC Rule is invalid when it granted appellees' motion for summary judgment and denied theirs on the plaintiffs' claim for declaratory relief under the APA. We review a trial court's summary judgment de novo. *See Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, we consider the summary-judgment evidence presented by both sides; determine all questions presented; and, if we determine that the trial court erred, render the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

State administrative agencies have only those powers that the legislature expressly confers upon them and those implied powers that are reasonably necessary to carry out their express functions or duties. *See Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex. 2001). Absent specific or implied statutory authority, an agency rule is invalid. *Id.* Furthermore, an agency may not exercise what is effectively a new power based on a claim that the exercise is expedient for administrative purposes. *Id.* To establish a rule's facial invalidity, a challenger must show that the rule (1) contravenes specific statutory language; (2) is counter to the statute's general objectives; or (3) imposes additional burdens, conditions, or restrictions in

10

excess of or inconsistent with the relevant statutory provisions. *Texas Ass'n of Acupuncture & Oriental Med. v. Texas Bd. of Chiropractic Exam'rs*, 524 S.W.3d 734, 739 (Tex. App.—Austin 2017, no pet.); *see also* Tex. Gov't Code § 2001.038(a) (authorizing "validity or applicability of a rule" to be "determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff").

Determining the validity of a rule requires us to construe the statutory language from which the agency's authority purportedly flows. *Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs*, 254 S.W.3d 714, 719–20 (Tex. App.—Austin 2008, pet. denied). In construing a statute, our primary objective is to give effect to the legislature's intent. *Liberty Mut. Ins. v. Adcock*, 412 S.W.3d 492, 494 (Tex. 2013). "The 'surest guide to what lawmakers intended' is the enacted language of a statute." *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018) (quoting *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 463 (Tex. 2009)). We defer to the agency's construction of a statute "only when the statutory language is ambiguous." *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016). If the statute is unambiguous, agency deference "has no place." *TracFone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013).

The detainees raised several grounds for invalidating the FRC Rule in their motion for summary judgment: (1) the Department lacks implied statutory authority to issue GRO licenses to Dilley and Karnes and regulate them because they are not GROs, due to the fact that parents reside in the facilities with their children; (2) Texas Family Code Section 54.011(f) prohibits the Department from assisting Dilley and Karnes in prolonging detention of immigrant children in secure facilities, *see* Tex. Fam. Code § 54.011(f); (3) the FRC Rule is not in harmony

11

with the general objectives of Chapter 42 of the Texas Human Resources Code; and (4) the Department adopted the FRC Rule without convening the required statutory "work group," *see* Tex. Hum. Res. Code § 42.042(i).

In its final judgment, the trial court granted the detainees' motion for summary judgment as to their claim for declaratory relief under the APA and determined that "[t]he FRC Rule contravenes Tex. Hum. Res. Code § 42.002(4) and runs counter to the general objectives of the Texas Human Resources Code and is, therefore, invalid." Appellants challenge the trial court's summary determination, asserting—as they did in their motion for summary judgment— that (1) Chapter 42 of the Human Resources Code provides "ample statutory authority" for the Department to have promulgated the FRC Rule, (2) the FRC Rule was adopted in substantial compliance with the applicable procedural requirements, (3) and Section 54.011 of the Family Code does not apply to the circumstances here.

We agree with the detainees' argument, which they made in their summary-judgment motion, that the Department lacks the express or implied statutory authority to license the Dilley and Karnes facilities—and regulate them as child-care facilities, including by promulgating the FRC Rule—because the children reside in the facilities *with their parents* and the facilities are therefore neither "child-care facilities" nor GROs. *Cf.* Tex. Hum. Res. Code § 42.002(3), (4) (defining "child-care facility" and GRO, respectively). Appellees allege that for over ten years, until the *Flores* decision and ICE's new immigration policy, the Department agreed that Chapter 42 does not authorize it to license or regulate facilities such as Dilley and Karnes, where children reside with their parents. Among other evidence in the record, they cite former Department Commissioner John J. Specia's statement in May 2015—in response to a request that the agency shut down Dilley—that "children reside at this facility with their parents.

12

It is for this reason that DFPS has neither jurisdiction nor standing." Appellees allege that the Department did an "about-face" just a few months later, after the *Flores* decision, when Dilley, Karnes, and ICE "aggressively sought" child-care licenses and the Department shortly thereafter promulgated the FRC Rule. While we note the alleged change in the Department's construction of Chapter 42 concerning its authority thereunder, we give that construction no deference unless we find the relevant statutes ambiguous, which we do not. *See Southwest Royalties*, 500 S.W.3d at 405.

In Chapter 42 of the Human Resources Code (entitled "Regulation of Certain Facilities, Homes, and Agencies that Provide Child-Care Services"), the term "child-care facility" means

> a facility licensed, certified, or registered by the department to provide assessment, care, training, education, custody, treatment, or supervision for a child who is not related by blood, marriage, or adoption to the owner or operator of the facility, for all or part of the 24-hour day, whether or not the facility is operated for profit or charges for the services it offers.

Tex. Hum. Res. Code § 42.002(3). A GRO is a "child-care facility that provides care for seven or more children for 24 hours a day, including facilities known as residential treatment centers and emergency shelters." *Id.* § 42.002(4). A GRO is, thus, a subset of a child-care facility. The Department contends that Dilley and Karnes are GROs because they provide twenty-four-hour "care"—including food and shelter—for seven or more children, meeting the definition in Section 42.002(4), and that the FRC Rule designating Dilley and Karnes as GROs and regulating them as such is therefore expressly authorized by statute.[6] *See* 26 Tex. Admin. Code § 748.7(b)

---

[6] While the FRC Rule does not expressly identify Dilley and Karnes, it defines FRCs as centers (1) operated by or under contract with ICE to enforce federal immigration laws (2) at which each child detained is with a parent or other adult family member who remains with

(providing that FRCs are GROs). The Department's argument continues: because GROs are child-care facilities, they are subject to the child-care licensing requirements and regulations in Subchapter C of Chapter 42 of the Human Resources Code, and the Department has the implied authority to promulgate rules regulating them. *See generally* Tex. Hum. Res. Code §§ 42.041–.068 (Subchapter C, entitled "Regulation of Certain Facilities, Homes, and Agencies"); *see also id.* § 42.041 (providing that "[n]o person may operate a child-care facility . . . without a license issued by the [D]epartment" and listing several facilities exempt from licensing requirements). We disagree, as explained below and considering Subchapter C in the context of the entirety of Chapter 42.

We first note that neither "care" nor "child care" is defined in Chapter 42. When a statute uses a word that it does not define, our task is to determine and apply the word's common, ordinary meaning. *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014). In determining the common, ordinary meaning of a term, we may look to a "wide variety of sources, including dictionary definitions, treatises and commentaries, our own prior constructions of the word in other contexts, the use and definition of the word in other statutes and ordinances, and the use of the words in our rules of evidence and procedure." *Id.* We must construe the term in the context of the statute in which it appears, analyzing the reasonableness of the term's different meanings, bearing in mind that the "words' meanings cannot be

---

the child and provides "the direct care" for the child except for "specific circumstances" when the child is cared for directly by the center or another adult in the custody of the center. 26 Tex. Admin. Code § 748.7(a). The rule does not explain what would constitute "specific circumstances," but evidence in the record indicates that it might include periodic parental hospitalization or illness (which has occurred only six times in the several years of the centers' operation). It is undisputed that Dilley and Karnes are the only facilities in Texas meeting the FRC Rule's definition of "family residential center."

14

determined in isolation but must be drawn from the context in which they are used." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

One reputable dictionary defines the noun "care," in the context of children, as "charge" and "supervision," i.e., "responsibility for or attention to health, well-being, and safety," *see Care*, Merriam-Webster Online Dictionary (www.merriam-webster.com/dictionary/care) (last visited February 1, 2023), and the noun "child care," relevantly here, as "the care of children especially as a service while parents are working," *see Child care*, Merriam-Webster Online Dictionary (www.merriam-webster.com/dictionary/childcare) (last visited February 1, 2023). The statute specifies that a "child-care facility" is a facility that provides certain services (including "care") to a child "who is not related by blood, marriage, or adoption to the [facility's] owner or operator," *see* Tex. Hum. Res. Code § 42.002(3), implying that the "care" of children contemplated to occur in such facilities is *in the absence of a child's parents*. This definition and the relevant, common, and ordinary meanings of "care" and "child care" lead to the only reasonable conclusion that the legislature granted the Department express and implied authority to regulate and license facilities that are charged with the responsibility for a child's health, safety, and well-being in lieu of a parent's usual responsibility therefor—that is, during a parent's absence. Thus, the FRC Rule that first defines an FRC as a center at which a child is "detained with a parent or other adult family member, who remains with the child" and who "*provides the direct care for the child*," 26 Tex. Admin. Code § 748.7(a) (emphasis added), but then classifies such a center as a GRO (i.e., a type of child-care facility that is charged with twenty-four-hour responsibility for children's health, safety, and well-being) exceeds the legislature's grant to the Department of licensing authority over "child-care facilities." Because parents reside at the FRCs with their children, the FRCs are not GROs.

15

This construction is compelled by Subchapter G of Chapter 42, entitled "Regulation of Temporary Shelter Day-Care Facilities." Subchapter G defines another category of facility: a "shelter," meaning

> a supervised publicly or privately operated shelter or other facility that is designed to provide temporary living accommodations to individuals and families, including a family violence shelter, a homeless shelter, and an emergency shelter. The term does not include a temporary facility established in response to a natural or other disaster.

Tex. Hum. Res. Code § 42.201(1). FRCs (i.e., Dilley and Karnes) indisputably meet this definition of "shelter"—they are supervised, privately operated, and designed to provide temporary living accommodations to undocumented families engaged in deportation proceedings. Should a "shelter" wish to provide "shelter care"—defined in Section 42.201 as "child care that is provided . . . while [the child's blood-related adult or managing conservator] is away from the shelter," among other requirements—it must either (a) obtain a temporary shelter permit (TSP) from the Department or (b) be licensed under Subchapter C (i.e., as a child-care facility). *See id.* §§ 42.201(2), .202(a), (b). A shelter that holds a TSP "is not required to hold a license under Subchapter C to operate a shelter day-care facility."[7] *Id.* § 42.202(c). But a "shelter day-care facility . . . *is not a child-care facility*, as defined by Section 42.002, and the provisions of this chapter and the department's rules that apply to a child-care facility licensed under Subchapter C do not apply to a shelter day-care facility." *Id.* § 42.207 (emphasis added); *see also id.* § 42.201(3) (defining "shelter day-care facility" as "a shelter that provides shelter care for not more than 24 hours a day, but at least four hours a day, three or more days a week"). Furthermore, a shelter need not obtain *either* a TSP or a Subchapter C license if it provides

---

[7] It is undisputed that Dilley and Karnes hold TSPs. The Department issued Dilley a TSP on May 22, 2015, and it issued one to Karnes on August 4, 2015.

16

shelter care for: *less than* four hours a day or three days a week *or* six or fewer children.[8]

*See id.* § 42.202(e). Because Subchapter G expressly excludes shelter day-care facilities from the definition of Subchapter C "child-care facilities," it follows that the Department is expressly prohibited from requiring shelter day-care facilities to be licensed or adhere to licensing regulations that apply only to child-care facilities.

The Department attempts to distinguish Subchapter G by arguing that Dilley and Karnes do not provide any "shelter care" because—apart from the occasional hospitalizations of parents offsite—any child care provided at the facilities happens while parents remain *onsite* but are unavailable to directly care for their children themselves, such as when they attend meetings with their lawyers. *Cf. id.* § 42.201(2) (defining shelter care). But this argument ignores the statutory text and context. First, as already explained above, Subchapter C applies only to "child-care facilities," which do not include facilities where children reside with their parents. Secondly, because shelters need not obtain *either* a TSP or a Subchapter C license if they provide only very limited "shelter care"—that is, child care for *less than* four hours a day or three days a week or for six or fewer children, *see id.*—it follows that shelters that do not provide *any* shelter care at all (i.e., shelters that provide child care only while parents are onsite) need not obtain either a TSP or a Subchapter C license (because "shelter care" that is provided for zero children or for zero hours or days per week necessarily fits into the "less than" category in the definition). Construing Subchapter G as the Department proposes would result in no licensing requirement for shelters providing child care while a resident parent is *offsite* yet requiring

---

[8] The record shows that some mothers at Dilley and Karnes require child care during brief periods when they are attending legal appointments or other brief meetings *onsite*, and while it shows that there have been a few times when mothers have been hospitalized briefly offsite, there is no evidence (or allegation) that child care has been needed or provided for more than six children at a time. *Cf.* Tex. Hum. Res. Code § 42.201(3).

licensing while a resident parent is *onsite*—an unreasonable construction that is unsupported by the statutory text.

Finally, our construction aligns with a Subchapter C exemption from licensing requirements for facilities that are operated in connection with an "establishment where children are cared for during short periods while parents . . . are . . . engaging in other activities . . . *on or near the premises*, that does not advertise as a child-care facility or day-care center, and that informs parents that it is not licensed by the state." *See id.* § 42.041(b)(3) (emphasis added). The only reasonable construction of the cited statutes in Subchapters C and G, reading them as a whole and in the context of the entire chapter, is that the legislature's express and implied delegation of authority to the Department to regulate and license facilities does not encompass facilities such as FRCs at which parents reside with their children.

We hold that the Department lacks the statutory authority to require the Dilley and Karnes facilities to obtain GRO (or other Subchapter C) licenses and, accordingly, lacks the statutory authority to promulgate rules regulating them as GROs or other child-care facilities. The FRC Rule is thus invalid, and the trial court did not err in invalidating the rule under the APA.[9] *See Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 477 (Tex. App.—Austin 1994, writ denied) ("An agency rule is invalid if (1) the agency had no statutory authority to promulgate it; (2) it was not promulgated pursuant to proper procedure; or (3) it is unconstitutional."). We overrule appellants' second issue.

---

[9] Although the trial court explained its reason for invalidating the rule slightly differently—that it "contravenes Tex. Hum. Res. Code § 42.002(4) and runs counter to the general objectives of the Texas Human Resources Code"—we nonetheless affirm its holding that the rule is invalid under the APA because appellate courts may consider all grounds for summary judgment that a movant has preserved for review and necessary for disposition of the appeal, even if the trial court did not expressly rule on the grounds. *See Cincinnati Life Ins. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996).

*Appellant GEO Group's third issue*

Appellant GEO Group, Inc.—the operator of Dilley—raises an issue (its third) that neither the Department nor the Corrections Corporation of America (the operator of Karnes) raises, contending that the plaintiffs are estopped from bringing their APA challenge to the FRC Rule. GEO argues that because the plaintiffs are putative members of the *Flores* class, in which proceeding they took the position—and from which they benefited per the consent decree—that undocumented minors must be placed in a program that is "licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children," *see Flores*, 212 F. Supp.3d at 877, they cannot now assert the "inconsistent" position in this lawsuit of attacking the FRC Rule. *See Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008) ("The doctrine of judicial estoppel 'precludes a party from adopting a position inconsistent with one that is maintained successfully in an earlier proceeding.'" (citation omitted)); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) ("Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken" and "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."); *Bexar Metro. Water Dist. v. City of San Antonio*, 228 S.W.3d 887, 895–96 (Tex. App.—Austin 2007, no pet.) ("A party that benefits from a position that it has taken in a consent decree is . . . estopped from later asserting an inconsistent position.").

However, as appellees respond in their brief, appellees' litigation positions are not inconsistent because the *Flores* consent decree cannot reasonably be construed as acquiescence in the promulgation of a rule that is invalid because it exceeds an agency's statutory authority and contravenes legislative intent. While the class members in *Flores* expressly agreed to be

placed in a "licensed program," it must be presumed that such contemplated licensing is authorized by and in compliance with applicable state laws. *Cf. Cayan v. Cayan*, 38 S.W.3d 161, 166 n.8 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("[A] court cannot construe a statute or a contract to impose or enforce an illegal obligation or otherwise compel an illegal act because the purpose of the legal system is to combat unlawfulness, not promote it."). We conclude that appellees are not estopped from raising their APA claim and accordingly overrule GEO's third issue.

***Whether the trial court properly issued injunctive relief***

A few days after the trial court signed its December 2, 2016 Final Judgment, the plaintiffs filed an "Emergency Motion to Prevent Automatic Suspension of Judgment on Appeal Pending A Decision on the Terms of any Supersedeas." In the motion, the plaintiffs stated that "[w]hile Plaintiffs prefer that the Court not authorize any suspension of its judgment, the Court may wish to impose terms that are substantively identical to the terms stated in this Court's temporary injunction issued June 3, 2016."[10] A hearing on the motion was held December 5, at which the defendants "notified the Court of their intent to (1) perfect an appeal and automatically supersede the Court's Final Judgment; (2) issue a license under the FRC Rule to . . . [Dilley]; and (3) give full force and effect to the license previously issued under the FRC Rule to . . . [Karnes]." On December 16 the trial court signed its Amended Final Judgment, "[a]fter reviewing Plaintiff's Motion to Prevent." The Amended Final Judgment vacated the December 2

---

[10] The temporary injunction—which was set to expire "no later than the date that this Court issues its decision after a final trial on the merits"—enjoined the Department from issuing an FRC license to Dilley (it had already issued a license to Karnes) and ordered the Department to "continue to investigate and report any allegations of abuse or neglect, standards deficiencies, or violation of rule of law" at Dilley and Karnes.

Final Judgment and substituted in its place an amended judgment with the same substantive provisions except for the addition of a section entitled "Injunctive Relief and Denial of Automatic Supersedeas."

That new section of the Amended Final Judgment contains the trial court's finding that "allowing Defendants to automatically supersede the Court's ruling that the FRC Rule is invalid would render the relief granted by this Amended Final Judgment ineffective and Plaintiffs would suffer imminent and irreparable harm" unless the "status quo" was preserved during the pendency of the appeal. To preserve the status quo, the Amended Final Judgment provided,

> Defendants . . . are ORDERED to refrain from issuing licenses under the FRC Rule until the Court of Appeals issues a decision on appeal or further Order of the Court.

> Defendants . . . are FURTHER ORDERED to continue to investigate and report any allegations of abuse or neglect, standards deficiencies, or violation(s) of rule of law at Karnes and Dilley during the pendency of any appeal of this Court's ruling.

In their final issue, appellants argue that it was improper for the trial court to issue the latter of the above orders—which they contend effectively constitutes a permanent injunction—and to require the Department to regulate the facilities during pendency of the appeal because plaintiffs did not specifically plead for that relief. *See Shields v. State*, 27 S.W.3d 267, 271 (Tex. App.—Austin 2000, no pet.) ("Persons seeking a permanent injunction must be specific in pleading the relief sought . . . ."); *Gause v. Gause*, 430 S.W.2d 409, 413 (Tex. App.— Austin 1968, no writ) (noting that permanent injunction must be sought in special prayer). Moreover, appellants contend, this portion of the Amended Final Judgment "runs contrary to [the

21

trial court's] own determination that the Department lacks statutory authority to adopt [the FRC Rule]." We agree with this latter contention.

We have determined that the Department lacks statutory authority to issue child care licenses to Dilley and Karnes and regulate them as GROs. The trial court's Amended Final Judgment prohibited the defendants from superseding the judgment while on appeal, and appellants do not appeal this ruling. *See* Tex. R. App. P. 24.2(c) (providing supersedeas procedures for non-money and non-property judgments). Because the trial court's judgment was not superseded, it is effective during the pendency of any appeals, and the trial court has an affirmative duty to enforce it. *See* Tex. R. Civ. P. 308. However, because the FRC Rule is invalid and the Department has no authority to license FRCs or apply licensing requirements to them, including the Minimum Standards,[11] we hold that the portion of the trial court's Amended Final Judgment ordering the Department to provide "regular and comprehensive oversight" of Dilley and Karnes, including its specific order that the Department "continue to investigate and report any allegations of abuse or neglect, standards deficiencies, or violation(s) of rule of law at Karnes and Dilley during the pendency of any appeal," cannot stand because it conflicts directly with the trial court's judgment on the merits of the plaintiffs' rule challenge.[12] We sustain appellants' final issue.

---

[11] While Chapter 42 requires the Health and Human Services Commission to adopt by rule "minimum standards" that, among other objectives, "promote the health, safety, and welfare of children" attending child-care facilities, the Human Resources Code delegates to the agency the discretion to delineate the specifics of such standards. *See* Tex. Hum. Res. Code § 42.042.

[12] Appellants do not take issue with the portion of the trial court's judgment that enjoins the Department from issuing licenses under the FRC Rule, and the Department does not challenge the trial court's denial of its right to automatically supersede the judgment. *See* Tex. R. App. P. 24.2(a)(3). Appellant GEO additionally argues that the "injunctive" portion of the Amended Final Judgment violates appellants' rights to due process because appellees' "Motion

22

## CONCLUSION

We reverse and vacate the portion of the Amended Final Judgment granting injunctive relief ordering the Department to "continue to investigate and report any allegations of abuse or neglect, standards deficiencies, or violation(s) of rule of law at Karnes and Dilley during the pendency of any appeal of this Court's ruling." We affirm the remainder of the judgment.

_____

Thomas J. Baker, Justice

Before Justices Baker, Kelly, and Smith

Affirmed in Part; Reversed and Vacated in Part on Remand

Filed: February 10, 2023

---

to Prevent Automatic Suspension of Judgment Pending Appeal" did not provide adequate notice about the issues to be considered at the hearing, which effectively was an "unnoticed hearing" on an "unfiled motion to modify the December 2 Final Judgment" and an "unfiled motion for reconsideration." We need not address this argument of GEO because of our holding that the trial court improperly issued injunctive relief.